The STATE of Ohio, Appellee,

v.

BOWSHIER, Appellant.

[Cite as *State v. Bowshier,* 167 Ohio App.3d 87, 2006-Ohio-2822.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 2005–CA–62.

Decided June 2, 2006.

88

Stephen S. Schumaker, Clark County Prosecuting Attorney, and William H. Lamb, Assistant Prosecuting Attorney for appellee.

James D. Marshall, for appellant.

***

Fain, Judge.

{¶ 1} Defendant-appellant, Teddy Bowshier, appeals from his conviction and sentence for intimidation. Bowshier contends that his conviction is against the manifest weight of the evidence and is not supported by the evidence. He also contends that a tape recording of telephone conversations he had with his girlfriend while he was in jail was erroneously admitted in evidence.

{¶ 2} We conclude that the inference that Bowshier, during and after his arrest, made certain reprehensible statements to the arresting police officer, threatening physical violence, with an awareness that his statements constituted an "attempt to influence, intimidate, or hinder" the officer is manifestly outweighed by the competing inference that Bowshier was aware merely that his outbursts constituted an expression of his fury at having been arrested. Therefore, the finding that Bowshier knowingly made an "attempt to influence, intimidate, or hinder" the officer, an element of the offense of intimidation, is against the manifest weight of the evidence.

{¶ 3} Because there is a possible inference arising from the evidence that would support the conviction, we conclude that the evidence is sufficient. We also conclude that the tape recording was sufficiently authenticated, so that the trial court did not err in admitting it.

{¶ 4} The judgment of the trial court is reversed, and this cause is remanded for a new trial.

I

{¶ 5} In late June 2004, Springfield police officers Brett Bower and Nicholas Holt were dispatched to Bowshier's apartment on a report of a disturbance. The officers saw large pieces of broken glass in the street in front of the apartment and began kicking them off the street. While they were doing this, they noticed Bonnie Arnold on the street corner, crying. Their efforts to speak to Arnold at that time were rebuffed.

{¶ 6} After first speaking to someone in the other half of a double residence, the officers knocked on Bowshier's door. Bower evidently knew Bowshier already. Bowshier was extremely agitated, was shouting, and appeared to the officers to be intoxicated. He and Arnold, his girlfriend, had been at a bar earlier. Bowshier had left the bar and come home without Arnold, who walked home from the bar. Bowshier indicated that in the ensuing argument, Arnold had broken furniture and glass, "which was laying all over the place." Bowshier told the officers that if Arnold returned, "I'm going to kick her ass, I'm going to kick her out."

{¶ 7} The officers persuaded Bowshier that it would be better for him to contact them if Arnold returned to the apartment. The officers then left.

{¶ 8} While parked nearby, completing paperwork, the officers noticed Arnold coming down the street. She went to the cruiser and told the officers that everything was fine, that she was going to Bowshier's apartment to pick up her shoes and a purse, and that she was going to go and stay at her mother's. Bower suggested that the officers accompany Arnold, but she declined. She did agree that they could observe from a distance, which they did.

{¶ 9} Bower described the interaction between Bowshier and Arnold as follows:

{¶ 10} "She started up the stairs to the porch. As she approached the door, the defendant swung the door open, pushed—half pushed and half struck her in the chest with the palm of his hand in this type of motion. [Indicating.]

{¶ 11} "She went backwards down the steps, was able to regain her balance without falling, but did have to take several steps backwards as she went down the steps."

{¶ 12} Bower described what happened next as follows:

{¶ 13} "Q. Okay. When you saw this happen, what did you do?

{¶ 14} "A. I followed my partner, who was already on his way, down the alley left or north on Race Street, crossed North Street, went up the—went up the steps to the porch. I grabbed Mr. Bowshier. I told him, 'I warned you. You're under arrest.' And at some point he pulled away and retreated back into the house, and we followed him into the house and effected an arrest.

{¶ 15} "Q. Okay. Once you went into the—to the house, can you describe how you effectuated that arrest?

{¶ 16} "A. Again, he retreated in the house. We had to follow him in there. At that point I grabbed him by his shirt around his chest. He continued to pull away. He pulled to his left. My partner and I followed him. We just went with the motion that he was—that he was making into the—into what would be the southwest corner of the living room.

{¶ 17} "While he's cursing me out and telling me he's going to kick my ass and break my skinny ass in half, I put my pepper spray near his face. I said, I'm— 'Stop resisting Teddy, or I'm going to spray you.' At some point he said, 'Fuck you.' And I sprayed him once with a—about a half second burst of pepper spray.

{¶ 18} "He had his glasses on. The pepper spray had no effect on his vision or his breathing, but it distracted him enough that we were able to get him cuffed at that point.

{¶ 19} " * * *

{¶ 20} "Q. Okay. Once you got Mr. Bowshier cuffed, what happened next, Officer?

{¶ 21} "A. More—more of the same with respect to the cussing and name calling, and he began spitting. Told him several times to stop spitting at me. He didn't stop so then we placed each one of us on either side of Mr. Bowshier, placed our arms under his arm with our hand over the shoulder to bend him over at the torso so that he couldn't spit upwards at us.

{¶ 22} " * * *

{¶ 23} "Q. Okay. Now, I hate to be indelicate; but it's part of this case. What type of—what types of things was Mr. Bowshier saying to you?  .

{¶ 24} "A. I have some notes over there. Could I refer to them?

{¶ 25} " * * *

{¶ 26} "Q. If you need anything additional to refresh, just—please continue.

{¶ 27} "A. Your direct quotations are in the notes; but the substance of the quotations are, 'Fuck you, Bowers. I'll kick your ass, Bowers. If you didn't have that badge, I'd kick your ass. When I see you out on the street, I'll shove that badge up your ass.' And I know that one was very close to 'if you want to go man-to-man, I'll break your skinny ass in half.' Then there was a couple more that I can't—

{¶ 28} "Q. Okay. All these were directed to you?

{¶ 29} "A. Yes."

{¶ 30} Two other officers transported Bowshier to the jail, but Bower also went to the jail, arriving soon after Bowshier, when the following ensued:

{¶ 31} "Q. Okay. When you arrived there, did you see Mr. Bowshier there?

{¶ 32} "A. Yes.

{¶ 33} "Q. And Mr. Bowshier at that point say anything to you?

{¶ 34} "A. 'Fuck you, Bowers. I'm going to kick your ass.' I believe the—the quote that I gave you about breaking my skinny ass in half, I believe that one actually occurred at the jail.

{¶ 35} "Q. How long were you at the jail—how long before you arrived at the jail after you left the scene at 604 West North Street?

{¶ 36} "A. How long did it take to get to the jail from 604?

{¶ 37} "Q. Yeah.

{¶ 38} "A. Five minutes.

{¶ 39} "Q. Okay. And how long were you there in Mr. Bowshier's presence?

{¶ 40} "A. Off and on for—for probably 45 minutes.

{¶ 41} "Q. Okay. At any point did Mr. Bowshier calm down and stop these—

{¶ 42} "A. No, sir. He—he continued, and at one point in front of a female prisoner—

{¶ 43} "MR. MARSHALL: Object, Your Honor. It's not responsive. It's not relevant for the reasons we discussed earlier.

{¶ 44} "THE COURT: Okay. I'll overrule it with respect to it being nonresponsive; but I will admonish the witness to only testify to what, if anything, the defendant said that was directed to you.

{¶ 45} "THE WITNESS: What he said or the gestures count as well?

{¶ 46} "THE COURT: Anything he did or said that was directed to you as opposed to anybody else.

{¶ 47} "A. Okay. What he said accompanied by the gesture, 'Come on, faggot. Come on. Suck my dick.' Pulled his pants down, was not—and exposed his penis."

{¶ 48} Holt also testified concerning Bowshier's arrest and its aftermath. Holt testified that when Bower first told Bowshier that he was under arrest, Bowshier said, "I didn't do a fucking thing." Then, after Bowshier was handcuffed, Bowshier said, "I didn't do a fucking thing, you guys can't arrest me for this. I didn't do anything." And, according to Holt, Bowshier kept trying to spit in Bower's face.

{¶ 49} On cross-examination, Holt, who had undergone pepper spraying as part of his training, acknowledged that a person who is pepper sprayed "might start spitting because of the effects of the pepper spray in their mouth."

{¶ 50} Holt testified that outside the house, as Bowshier was being taken into custody, Bowshier "threatened to—threatened to beat him [Bower] up several times; threatened to assault him there; and later on that same evening, he did the same thing." Later, at the jail, according to Holt:

{¶ 51} "The defendant was still highly agitated and angry, cursing, threatening Officer Bower. He made the comment that he would—if he saw Officer Bower out on the street, that he would snap him like a twig. He was going to beat his ass and take his badge and shove it up his ass. He threatened to assault him numerous times.

{¶ 52} "Kept saying over and over again calling Officer Bower—basically, he was yelling at quite a few people in the jail; but mostly directed at Officer Bower stating, you know, telling him he was a—calling him a faggot and telling him to suck his dick, just making all sorts of crude comments and threatening."

{¶ 53} On cross-examination, Holt testified that Bowshier "was yelling because he was furious about being arrested." In his report, Holt wrote: "When officers arrived at the jail, defendant was still furious about being arrested and repeatedly made dirty comments and threatened physical harm to Officer Bower."

{¶ 54} Robin Carter, a police service clerk at the jail, essentially corroborated Bower's and Holt's testimony concerning Bowshier's demeanor at the jail. Additionally, she testified that from the very moment Bowshier was brought into the jail, before Bower's subsequent arrival, "[Bowshier] was very irate and swearing, causing all kinds of ruckus and cussing at the deputies and the officers that brought him in."

{¶ 55} While at the jail, Bowshier appears to have made several telephone calls to Arnold, which were taped as part of the routine at the jail.

{¶ 56} Bowshier was charged with domestic violence and intimidation. During his jury trial, the state reduced the domestic-violence charge to assault, conceding a failure of proof of the relationship between Bowshier and Arnold required for a domestic violence conviction. The jury found Bowshier not guilty of assault, but guilty of intimidation. Bowshier, who was evidently on federal parole for a 2001 federal drug conviction and had prior convictions for domestic violence, aggravated assault, and possession of marijuana, was sentenced to four years' imprisonment.

{¶ 57} From his conviction and sentence, Bowshier appeals.

## II

{¶ 58} Bowshier's third assignment of error is as follows:

{¶ 59} "The jury verdict should be reversed because it was against the manifest weight of the evidence."

{¶ 60} Intimidation, the offense with which Bowshier was charged and of which he was convicted, is proscribed by R.C. 2921.03(A), as follows:

{¶ 61} "No person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant * * * in the discharge of the person's duty."

{¶ 62} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 63} There is no question that Bowshier threatened Bower with bodily harm in a disgusting and vile manner. There is no evidence that Bower was, in fact, influenced, intimidated, or hindered in the performance of his duties as a result of Bowshier's threats. The key issue concerns the state's burden of proving that in uttering his vile remarks, Bowshier knowingly attempted to influence, intimidate, or hinder Bower. This would require that Bowshier knew, when he made his remarks, that they would probably be of a nature that they would constitute an attempt to influence, intimidate, or hinder Bower.

{¶ 64} Bowshier did not testify. Nor were any out-of-court statements of Bowshier introduced that would provide direct evidence of his knowledge when making his vile threats of bodily violence upon Bower. Therefore, proof of Bowshier's knowledge is necessarily circumstantial; it must be inferred what Bowshier knew when he made the remarks.

{¶ 65} One potential inference is that Bowshier understood that his threats of bodily harm against Bower would constitute an attempt to influence, intimidate, or hinder Bower in the performance of his duties, presumably by dropping the charges against Bowshier and releasing him, or perhaps by reducing those charges. Another potential inference is that Bowshier understood nothing of the kind, but was instead venting his frustration and rage at having been arrested under circumstances in which, with at least some reasonable basis, he considered himself to have been the victim of his girlfriend's misconduct.

■■ {¶ 66} With respect to weight-of-the-evidence reviews on appeal, we have distinguished the weighing of competing inferences from the weighing of credibility, concluding that an appellate court does not need to be as deferential to a finder of fact in reviewing the weight of competing inferences. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in [*State v.*] *Thompkins* [ (1997), 78 Ohio St.3d 380, 678 N.E.2d 541], we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence—in short, how persuasive it is." *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684.

{¶ 67} Significantly, *State v. Thompkins,* supra, which expanded the traditional scope of appellate weight-of-the-evidence review, involved competing inferences, which are also the key considerations in the case before us.

{¶ 68} In our view, the inference in the case before us that Bowshier, in threatening Bower with bodily harm, was venting his fury at Bower's having arrested him, and did not understand that his threats would constitute an attempt to influence, intimidate, or hinder Bower, clearly outweighs the contrary inference that Bower understood that his threats were an attempt to influence, intimidate, or hinder Bower. In this regard, we note Holt's characterization, in his report, that Bowshier "was still furious about being arrested and repeatedly made dirty comments and threatened physical harm to Officer Bower." We also note that Bowshier's threats appear to have been made unconditionally. That is, there is nothing in his remarks that we can find to have suggested, either expressly or by implication, that Bowshier would physically harm Bower *unless* Bower either let him go or went easy on him. An attempt to influence, intimidate or hinder Bower would involve a quid pro quo: let me go or I will hurt you.

{¶ 69} We conclude, then, that this is the rare case in which the factfinder lost its way in weighing the evidence and reached a conclusion that is a miscarriage of justice. See *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717, cited approvingly in *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541.

{¶ 70} Bowshier's third assignment of error is sustained.

## III

{¶ 71} Bowshier's second assignment of error is as follows:

{¶ 72} "The evidence was insufficient to convict defendant of intimidation."

{¶ 73} For the reasons indicated in Part II, above, we conclude that one possible inference arising from Bowshier's physical threats to Bower is that Bowshier understood that his threats constituted an attempt to influence, intimidate, or hinder Bower in the performance of his official duties. This inference involves a conclusion that Bowshier would understand that his threats would have the effect of attempting to induce Bower to placate Bowshier by either letting Bowshier go, or by going easy on him. Because a mere attempt to influence, intimidate, or hinder the public official is sufficient, it is not necessary that the attempt actually had that effect. Because the element of "knowingly" is in the statute, it is necessary that the utterer of the threats shall have understood that his threats would constitute an attempt to influence, intimidate, or hinder the public official.

{¶ 74} We conclude that the evidence in the record, together with all reasonable inferences, when viewed in a light most favorable to the state, would permit a reasonable jury to conclude, beyond reasonable doubt, that Bowshier understood that his threats of physical violence constituted an attempt to influence, intimidate, or hinder Bower in the performance of his official duties. Accordingly, Bowshier's second assignment of error is overruled.

## IV

{¶ 75} Bowshier's first assignment of error is as follows:

{¶ 76} "The court erred by allowing into evidence over defendant's objection a tape recording of telephone conversations allegedly between defendant and another individual."

{¶ 77} Bowshier contends that a tape recording of certain conversations, admitted in evidence over his objection, was not sufficiently authenticated. The state offered the tape recording on the theory that the conversations were between Bowshier and Arnold, conducted over the telephone while Bowshier was

in jail on these charges. Several conversations, recorded on the same day, were played to the jury from a single tape. A number of redactions were made.

{¶ 78} We have listened to the tape. While there may have been irrelevant and prejudicial statements on the tape pertaining to the assault charge, on which Bowshier was acquitted, the statements pertaining to the intimidation charge were of limited materiality. Although Bowshier acknowledged having made some threatening comments to Bower, his acknowledgment was general and conclusory, and added nothing to the testimony of Bower and Holt concerning the threats.

{¶ 79} As Bowshier acknowledges, Evid.R. 901(A) provides generally: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." As Bowshier also acknowledges, Evid.R. 901(B)(5) provides that "[b]y way of illustration only, and not by limitation" the following example of sufficient authentication under the Rule: "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

{¶ 80} Bower testified that the voices on the tape were those of Bowshier and Arnold. Bower had heard Bowshier and Arnold both speak, at the time of the arrest, if not, in Bowshier's case, even before then. Bowshier complains that Bower had not heard the voices of either Bowshier or Arnold over the telephone, or, for that matter, as recorded over the telephone. In our view, Evid.R. 901 does not require that a witness identifying a voice must have heard that voice in the same medium in order to identify it. If the identifying witness has an opinion, based upon having heard the voice previously, the witness may express it. The circumstances of the witness's having previously heard the voice, including any differences in those attendant circumstances from the witness's listening to the voice at the time of identification, affect the weight to be given to the witness's testimony.

{¶ 81} In this case, there were circumstances corroborating Bower's in-court identification of the voices on the tape recording. These circumstances included testimony by a jail official that the telephone calls recorded were made to the telephone number Bowshier had given as his telephone number, from the section of the jail where he was a prisoner, at a time when he was a prisoner. In our view, this evidence, together with Bower's testimony identifying the voices, is "sufficient to support a finding that the matter in question is what its proponent claims."

{¶ 82} Bowshier's first assignment of error is overruled.

V

{¶ 83} Bowshier's first and second assignments of error have been overruled; his third assignment of error is sustained. App. R. 12(B) provides that a court of appeals may enter judgment in an appellant's favor when it concludes that the appellant is entitled to judgment as a matter of law. This provision does not apply, because we have had to weigh the evidence to sustain Bowshier's third assignment of error, so we cannot conclude that he is entitled to judgment as a matter of law. App. R. 12(C) permits the entry of judgment in an appellant's favor in a civil case where there has been a bench trial, and the judgment is reversed as being against the manifest weight of the evidence. Obviously, App.R. 12(C) does not apply, because this was neither a civil case nor a bench trial. "In all other cases where the court of appeals finds error prejudicial to the appellant, the judgment or final order of the trial court shall be reversed and the cause shall be remanded * * * for further proceedings." App.R. 12(D). We conclude, therefore, that the extent of the relief we may afford Bowshier, upon sustaining his third assignment of error, is limited to the reversal of the judgment of the trial court and the remand of this cause for a new trial.

{¶ 84} We find support for this conclusion in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, the decision expanding the scope of weight-of-the-evidence reviews on appeal. In that case, the Ohio Supreme Court quoted with approval the following passage in *Tibbs v. Florida* (1982), 457 U.S. 31, 41–43, 102 S.Ct. 2211, 72 L.Ed.2d 652:

{¶ 85} "As we suggested just last Term, these policies do not have the same force when a judge disagrees with a jury's resolution of conflicting evidence and concludes that a guilty verdict is against the weight of the evidence. * * * A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves. A deadlocked jury, we consistently have recognized, does not result in an acquittal barring retrial under the Double Jeopardy Clause. Similarly, an appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.

{¶ 86} "A reversal based on the weight of the evidence, moreover, can occur only after the State both has presented sufficient evidence to support conviction and has persuaded the jury to convict. The reversal simply affords the defendant a second opportunity to seek a favorable judgment. An appellate court's decision to give the defendant this second chance does not create 'an unacceptably high

risk that the Government, with its superior resources, [will] wear down [the] defendant' and obtain conviction solely through its persistence."

{¶ 87} Earlier, in *State v. Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, the Ohio Supreme Court expressly recognized that when an appellate court reverses a judgment on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "13th juror." As a "13th juror," the appellate court has no power to impose its factual conclusion upon the jury of 12 that returned the original verdict, but merely, by its contrary view of the facts, to hang the jury "of 13," requiring a retrial (unless, of course, the state decides to dismiss the charge, the defendant decides to plead guilty as charged, or a plea bargain is negotiated).

{¶ 88} The judgment of the trial court is reversed, and this cause is remanded for a new trial.

Judgment accordingly.

BROGAN and WOLFF, JJ., concur.