[Cite as *State v. Wise*, 2018-Ohio-3519.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No. 17CA15 |
| v. | : | |
| | | DECISION AND |
| JOSHUA KANE WISE, | : | JUDGMENT ENTRY |
| Defendant-Appellant. | : | RELEASED 08/24/2018 |

APPEARANCES:

Timothy Young, Ohio Public Defender, and Allen Vender, Assistant Ohio Public Defender, Columbus, Ohio, for defendant-appellant.

Keller J. Blackburn, Athens County Prosecuting Attorney, and Merry M. Saunders, Athens County Assistant Prosecuting Attorney, Athens, Ohio, for plaintiff-appellee.

Hoover, P.J.

{¶1}   Joshua Kane Wise ("Wise") appeals his conviction and sentence entered in the Athens County Court of Common Pleas on April 5, 2017. Following a jury trial, Wise was found guilty of intimidation and obstructing official business[1]. On appeal, Wise contends that sufficient evidence did not exist in order to convict him of intimidation. Having reviewed the record, we find no merit in Wise's assignment of error. Accordingly, we affirm the judgment of the trial court.

**I. Facts and Procedural History**

{¶2}   In August 2016, Wise was indicted on two counts: Count 1 – intimidation in violation of R.C. 2921.03(A), a felony of the third degree; and Count 2 –obstructing official

---

[1] The obstructing official business conviction is not being appealed.

business in violation of R.C. 2921.31(A), a misdemeanor of the second degree. Eventually, a jury trial commenced in February 2017. The State presented witnesses, Lana Lanning, Deputy Keith Wright, and Deputy Jason Wickmann; and the defense presented Wise and James Mathena. The State then called Deputy Jason Wickmann as a rebuttal witness.

{¶3}   Lana Lanning ("Lanning") testified first. In July 2016, Lanning and Wise lived together in Chauncey, Ohio, with their child, who was 10 years old; Wise's child, who was 14 years old; and Lanning's child, who was 2 years old. Lanning stated that she and Wise had lived together for approximately 6 years. Lanning worked as a corrections officer. Lanning and Wise had been arguing for about a half an hour. Their arguments ensued because a woman had sent text messages to Wise informing him that Lanning had sent nude photos of herself to the woman's husband. Wise reacted by yelling at Lanning and calling her vulgar names. Lanning admitted, however, that Wise did not threaten physical harm or do anything physically harmful to her. Lanning was not concerned for her safety; she just wanted to leave. Lanning testified that she called 911 for help to leave the residence because she thought Wise had disabled her car. She later learned that Wise had not disabled her car.

{¶4}   Lanning testified that Deputy Keith Wright ("Deputy Wright") was the first officer to arrive in response to the 911 call. Lanning knew Deputy Wright before the incident because they had worked together as corrections officers at the Southeastern Ohio Regional Jail. Lanning told Deputy Wright that Wise had not threatened her or harmed her. She told Deputy Wright that she wanted to "get [her children's and her] stuff" and to "be able to take off." With Deputy Wright present, Lanning was walking back and forth from her car to the residence packing personal property that she claimed was the children's and her property. Wise continued to cuss and yell at Lanning even with Deputy Wright present.

{¶5}    According to Lanning, another deputy, Deputy Wickmann, arrived at the residence. Lanning and Deputy Wickmann knew each other before this incident as they had gone to school together and were Facebook friends. Deputy Wickmann helped Lanning carry some of her bags out to the car. Lanning made approximately 10 trips to and from the house to the car taking personal property out of the residence. Lanning testified that she heard Wise say that Deputy Wickmann was a "tough guy with a badge." Lanning also testified that she heard Deputy Wickmann tell Deputy Wright "he was waiting for [Wise] to say something so he can maul him."

{¶6}    Lanning further testified that she gave a video interview on the date of the incident. The contents of the video are as follows:

BY DEPUTY WRIGHT: Deputy Wright, Athens County Sheriff's Office, July 1st, 7:02 p.m. with Lana Lanning.

BY MS. LANNING: The officers came. There was a verbal dispute. The officers came and I was packing my stuff up. He continued to run his mouth, cuss. The officers told him several times to not be in the room that I was in. And he didn't listen. And then I was taking my stuff outside and the officers were out there and then he said that, something about that they weren't bad asses or something with their uniforms, for them to take their badge off. And then as the officers said they were coming in he locked the door, slammed it, and then the officers (inaudible) the door. And then he was arrested. I don't know what else to say.

BY DEPUTY WRIGHT: Thank you. (Inaudible)

{¶7}     At trial, Lanning testified that Wise was yelling in the doorway of the residence. The deputies took off running up the ramp; and Wise shut the door. Then, Deputy Wickmann kicked the door open. Lanning stated that Deputy Wickmann "didn't touch the door knob. He just went straight, jumped in, and just put his foot up and just kicked. So I mean he didn't check the knob to see if it was locked." Lanning testified that she did not hear Wise threaten to kill Deputy Wickmann. Lanning also did not hear Deputy Wickmann tell Wise he was under arrest. She said she did not see anything after the door was kicked open.

{¶8}     Next, the State presented Deputy Wright as a witness. In January 2013, Deputy Wright completed the Police Officer Training Academy through the Athens County Sheriff's Office where he had been working full-time as a deputy for about 6 months at the time of the incident. Deputy Wright confirmed Lanning's testimony that he was the first deputy to arrive on the scene. Lanning had told him that Wise had made no threats of violence or physical violence towards her; but Wise was drunk; and she just wanted to "get out of there, grab some items, and leave in the vehicle." Lanning had told Deputy Wright that she "didn't want anything done, she just wanted to gather clothing items for the children and herself and leave the premises for the evening."

{¶9}     Deputy Wright also confirmed Lanning's testimony that he had worked with her at the Southeastern Ohio Regional Jail. However, he stated that they were not on the same shift. He said that she was just an acquaintance and a Facebook friend at one point. They did not have contact outside the jail not relating to calls with the Sheriff's office.

{¶10}   Deputy Wright testified that he and Lanning were trying to open the hood of her vehicle when Wise came outside of the residence and began screaming insults at Lanning. At this time, Deputy Wickmann arrived on the scene. The two deputies then attempted to enter the

residence; but Wise told them they did not have permission to enter the residence without a warrant. However, because Lanning lived at the residence also, the deputies simply asked her for permission to enter the residence, which Lanning granted. While the deputies were in the residence, Lanning packed and gathered bags full of clothing. Wise was upset because he did not want Lanning taking items for which he had paid. According to Deputy Wright, although they had told Wise to stop yelling at Lanning and to allow her to get the items, Wise continued to get up off the couch and yell at Lanning. Wise also hollered at the deputies yelling profanities. Deputy Wright testified that Wise "* * * used the F word quite often. He said that F ourselves and our dirty F-ing Sheriff, our dirty F-ing Prosecutor." Deputy Wright explained that Wise used the F word twenty to thirty times in combinations that he had never heard before.

{¶11} Deputy Wright testified to Wise's state of intoxication also. Wise appeared "highly intoxicated." His speech was slurred; he was stumbling; and he had an odor of alcohol about him. Deputy Wright also told the jury that they had tried to make Wise stay on the couch; but he refused to stay in one spot. Deputy Wright told Wise that he could "face charges if he continued to behave the way he was behaving towards us by yelling and constantly getting up and disobeying commands and screaming obscenities" at Lanning.

{¶12} When Lanning was finished packing her car, Deputy Wright told Wise to stay in the residence. Deputy Wright denied hearing Deputy Wickmann say anything about mauling Wise. Deputy Wright testified that he was out in front of the residence with Lanning; Deputy Wickmann was outside as well; and the front door of the residence was shut with Wise inside.

{¶13} Then, the door flew open. Wise had come out onto the porch after being told to stay inside. Deputy Wright testified that Deputy Wickmann and Wise were approximately 10 to 20 feet apart. Wise was shouting at Deputy Wickmann that he should kick his ass and that

Deputy Wickmann "wasn't so tough without that badge and if he ever saw him without the badge or uniform he would fucking kill him." Deputy Wickmann responded by telling Wise that he was under arrest for intimidation. Wise then turned, went through the front door, and shut the door as Deputy Wickmann yelled for him to stop. Next, Deputy Wickmann kicked in the front door. Wise was behind the doorway; and Deputy Wickmann was trying to handcuff him. Deputy Wright further testified that Wise was pulling away and jerking his arms. When they tried to grab his arms, they went to the ground.

{¶14} Deputy Wright testified that Wise immediately rolled over to his stomach and pulled his arms into a position under his chest, intentionally pulling away and trying to hide his hands and wrists. Wise continued to scream more obscenities and insults. Eventually, they were able to handcuff Wise, advise him that he was under arrest, and place him in Wickmann's patrol car. Deputy Wright told the jury that he felt an arrest was appropriate because:

> Threats and threats of violence are a completely different matter alltogether [sic] with much less leniency for any kind of threats of violence. This is not a threat of I'm going to beat you up. This is I'm going to fucking kill you.

In addition, Deputy Wright stated, "* * * as soon as you hear the words I'm going to kill you, I'm going to fucking kill you is a lot different than calling you a douchebag. One's a drunken threat and one is a threat of serious physical violence."

{¶15} The State's final witness in its case-in-chief was Deputy Wickmann. Deputy Wickmann was also a Deputy Sheriff with the Athens County Sheriff's Office. Deputy Wickmann was working on July 1, 2016; and he had responded to the disturbance at the Lanning/Wise residence. When Deputy Wickmann arrived at the residence, Deputy Wright was present and was speaking to Lanning. Deputy Wickmann next tried to open the hood of

Lanning's vehicle. At this time, Wise came out on the porch yelling at them. Both deputies told Wise to go back in the house. As the deputies went to the front door, Wise refused their entrance. Deputy Wickmann reiterated Deputy Wright's testimony that Lanning gave them consent to enter the premises. Deputy Wickmann further verified that Wise was yelling obscenities to Lanning and both deputies. Lanning continued to take bags of personal property out to her vehicle, which infuriated Wise. Deputy Wickmann testified that Wise continued to get up and down from the couch, screaming and yelling.

{¶16} Deputy Wickmann further testified that after Wise continued to be loud, Deputy Wickmann told him that he would be placed under arrest if he did not sit down and be quiet. Wise's response was to scream, "fuck you, fuck you, fuck you." At that point, Deputy Wickmann said, "you want to know what, fuck this, we're out, let's go, Lana let's get your stuff, we're leaving now." When Deputy Wickmann started walking down the driveway, he heard Wise say, "[Y]ou think you're tough with that badge on * * * [I]f I ever find you out of that fucking uniform I will fucking kill you." Wise then turned around and went straight into the house.

{¶17} Deputy Wickmann testified that he "took off" after Wise because he had made a serious threat to "fucking kill" him. Wickmann testified as follows:

Q. And why did you take off at that point in time?

A. Well at that point in time I took off because of the fact that, you know, the man just made a serious threat to, to fucking kill me, and runs into the house and shuts the door. I have no idea what, what kind of threats are behind that door, if there's any guns, ball bats, anything like that. I have nothing, no idea what is running through at that time. So my, my reaction was to run and get him.

Deputy Wickmann next testified that he took Wise's threat seriously. Because Deputy Wickmann had already told Wise that he was under arrest, Deputy Wickmann kicked the door open. He could feel that Wise was behind the door. Deputy Wickmann then "barreled through the door the rest of the way."

{¶18}   Deputy Wickmann continued his testimony explaining that as the door opened, Wise headed to the living room. Deputy Wickmann grabbed Wise's left arm and again told him that he was under arrest. Wise then spun towards Deputy Wickmann to try to get his arm away from him. Deputy Wright then grabbed Wise; and the three men went straight to the ground. Deputy Wickmann verified Deputy Wright's testimony that Wise curled up and put his arms underneath his chest. Wise refused to give the deputies his hands; so they had to pry his arms out from under him. After the deputies secured Wise, they placed him in the back seat of Deputy Wickmann's cruiser.

{¶19}   Next, Deputy Wickmann explained to the jury that he was intimidated by Wise's statement. Deputy Wickmann further testified that Wise's statement caused him stress because it made him worry about his safety. Deputy Wickmann explained that he believed that Wise was trying to stop the deputies from doing their job by threatening them. Deputy Wickmann also testified that when Wise ran back into the home, that it made his job more difficult. Deputy Wickmann claimed that Wise hindered and delayed the deputies' duties by "running back in the house, shutting the door, holding the door closed against [him], and then going to the ground and pulling his arms underneath and not releasing them when he was commanded to do so." Also, Deputy Wickmann denied the comment that Lanning claimed he made about "waiting for [Wise] to say something so he can maul him."

{¶20}  On cross-examination, Deputy Wickmann admitted that after Wise told him that he was "going to fucking kill [him]" that there was no part of his job that he did not do.

Q. Did he say he kill you or kick your ass?

A. He said he was going to fucking kill me.

Q. Fucking kill you. Okay.

A. Yes.

Q. What part of your job did you not do after he said that?

A. Nothing, sir.

{¶21}  Wise next testified in his own defense. Wise explained to the jury the reason that he was upset; a woman had sent Wise risqué texts and nude photos of Lanning. Apparently, Lanning had sent the texts and photos to the woman's husband, a fellow corrections officer. Because of this, Wise and Lanning had been arguing; and Lanning called law enforcement. Wise testified that Officer Wright responded to the call first; and then Officer Wickmann arrived. Wise told the jury that Officer Wickmann used profanity, telling Wise to "shut [his] fucking mouth and sit [his] ass down." Wise was upset because the officers were helping Lanning take property out of the home. Wise admitted yelling, "Fuck you!" towards Officer Wickmann in response to the officer yelling the same to him.

{¶22}  Wise testified that as Officer Wickmann walked out with Lanning, Wise told him, "she's yours now." In response, Officer Wickmann "flipped off" Wise and said, "fuck you." Wise responded, "there's another tough guy with a badge and a uniform." Wise denied saying anything about killing Officer Wickmann. Wise also denied hearing Officer Wickmann tell him he was under arrest.

{¶23} Wise then told the jury that he had shut the door to his home and sat down on his couch. Wise denied holding the door shut. As Wise sat down, the door was kicked open; and Officer Wickmann grabbed him by the arms and pulled him to the floor. Then, Officer Wright joined Officer Wickmann; and, according to Wise, they kneed, kicked, and hit him. Wise further claimed that he had contusions to his face and head, bruised ribs, bruised stomach, and a bloody lip. Wise stated that he was checked for a ruptured spleen and that he had a swollen wrist as a result of being twisted.

{¶24} Wise denied that he held his arms underneath in order to avoid being handcuffed. Wise explained that his arms were already out when he was pulled to the ground. Wise was then handcuffed behind his back. Wise reiterated that he did not threaten either Officer Wickmann or Officer Wright; and he did not do anything to prevent them from performing their duties. Wise denied telling the officers that they should take off their badges. Wise denied making any threats to the officers:

Q. You told Deputy Wickmann that you should kick his ass.

A. I never said that either.

Q. You told Deputy Wickman that if you found him out of his uniform you would F-ing kill him.

A. No, not at all. My family's law enforcement so I would never threaten a law enforcement officer.

Q. You say you would never threaten a law enforcement officer?

A. Yes. With death and things like that? No way.

Q. Oh. Now you've modified it. You wouldn't threaten them with death. You have threatened law enforcement officers before.

A. Kicking butts? Killing? No.

Q. But you have threatened law enforcement officers before.

A. No.

{¶25}   The defense next presented James Mathena ("Mathena") as a witness. Mathena was Wise's friend. Mathena saw the door "kicked in." Mathena did not hear Wise make any threats to anyone that day.

{¶26}   On rebuttal, the State called Officer Wickmann back to the stand. Officer Wickmann testified that he only used the "F word" once during the interaction with Wise. Officer Wickmann denied elbowing and kneeing Wise.

{¶27}   Ultimately, the jury rejected Wise's version of events and found him guilty of both charges. Wise was sentenced in April 2017. He was sentenced to serve 18 months in the State Penal System on the intimidation charge and 90 days jail on the obstructing official business charge. The trial court ordered the two terms to run concurrently.

{¶28}   Wise filed a timely notice of appeal.

## II. Assignment of Error

{¶29}   On appeal, Wise assigns the following error for our review:

The trial court violated Joshua Wise's rights to due process and a fair trial when, in the absence of sufficient evidence, it entered a judgment of conviction for intimation. Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16, of the Ohio Constitution. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Jackson v. Virginia*, 443 U.S 307, 309, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979); R.C. 2921.03; Day Two, Tr. 2, 78; April 5, 2017, Judgment Entry.

## III. Law and Analysis

## A. Standard of Review

{¶30} In his sole assignment of error, Wise contends that the trial court violated his rights to due process and a fair trial when, in the absence of sufficient evidence, the trial court convicted him of intimidation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16, of the Ohio Constitution.

{¶31} "When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt." *State v. Davis,* 4th Dist. Ross No. 12CA3336, 2013-Ohio-1504, ¶ 12. "The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *Id.,* citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Therefore, when we review a sufficiency of the evidence claim in a criminal case, we review the evidence in a light most favorable to the prosecution. *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion the trier of fact did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

**B. The State Presented Sufficient Evidence to Support an Intimidation Conviction**

{¶32} Because Wise is making a sufficiency of the evidence argument, we assume arguendo that Wise did make the statement— "If I ever find you out of that fucking uniform I will fucking kill you." Wise makes the argument that he cannot be convicted of intimidation if the threat does not reflect a desire to prevent the official from discharging his duties. Wise claims

that the statement was an expression of anger and not an attempt to stop the deputy from doing

his job. On the other hand, the State argues that Wise's conviction for intimidation was

supported by sufficient evidence. The State argues that Officer Wickmann was unable to perform

the remainder of his duties at the domestic disturbance because of Wise's threatening words.

{¶33}  The intimidation offense at issue reads in pertinent part as follows:

No person, knowingly and by force, by unlawful threat of harm to any person or

property, * * * shall attempt to influence, intimidate, or hinder a public servant, a

party official, or witness in the discharge of the person's duty.

R.C. 2921.03(A)

{¶34}  "A person acts knowingly, regardless of purpose, when the person is aware that

the person's conduct will probably cause a certain result or will probably be of a certain nature.

A person has knowledge of circumstances when the person is aware that such circumstances

probably exist. * * *." R.C. 2901.22(B).

{¶35}  Wise claims that he made the statement with no intention of gaining an expected

result; instead, he argues that the statement was made out of anger and frustration. Wise cites to

this Court's decision in *State v. Simms*, 165 Ohio App.3d 83, 2005-Ohio-5681, 844 N.E.2d 1212,

¶14 (4th Dist.), for the proposition that "even threats do not constitute intimidation if they are not

made with the intention of gaining an expected result." We have no quarrel with the proposition.

Simms, like Wise, had argued that he did not make threats against the law enforcement officers

to gain an expected result; however, Simms admitted that he told the law enforcement officers

that he had a rifle and a gun in order to keep the officers from arresting him on the spot. As a

result, this Court found that the evidence presented to the jury was indeed sufficient to support a conviction of intimidation.

{¶36} This Court again found evidence sufficient to support an intimidation conviction in *State v. Tuck,* 4th Dist. Scioto No. 09CA3274, 2010-Ohio-4770. Tuck was an inmate housed in the Southern Ohio Correctional Facility. Tuck had threatened to kill case managers; however, he claimed that he made the threats out of frustration and not with any intention to influence future conduct. *Id*. at ¶ 22. This Court found that Tuck's threats were not an impulsive act but instead were carefully thought out and planned. *Id.* at ¶ 29. In addition, the Court found that the victims did not have a personal relationship with Tuck. *Id.* at ¶ 30. Therefore, this Court affirmed the intimidation conviction. Admittedly, the facts of *Tuck* are quite distinguishable from the facts of the case sub judice. However, in coming to its conclusion that sufficient evidence supported an intimidation conviction in *Tuck*, this Court relied upon a more similar case, *State v. Bowshier*, 167 Ohio App.3d 87, 2006-Ohio-2822, 853 N.E.2d 1210 (2d Dist.).

{¶37} We find that *Bowshier* is instructive in this case as well. In *Bowshier*, two police officers had been dispatched to Bowshier's apartment on a report of a disturbance. *Id.* at ¶ 5. Bowshier appeared to be agitated and intoxicated; and he was shouting. *Id.* at ¶ 6. Bowshier and his girlfriend Arnold had gotten into an argument; and Bowshier wanted Arnold out of his apartment. *Id.* at ¶ 6. The officers had seen Bowshier "half [push] and half [strike]" Arnold in the chest. *Id.* at ¶ 10. This caused them to try to arrest Bowshier. *Id.* at ¶ 14. While trying to effectuate the arrest, Bowshier retreated into his apartment. *Id.* at ¶ 14. While trying to arrest Bowshier, one of the officers sprayed him with pepper spray. *Id.* at ¶ 17. Bowshier told one of the officers:

> Fuck you, Bowers. I'll kick your ass, Bowers. If you didn't have that badge, I'd kick your ass. When I see you out on the street, I'll shove that badge up your ass * * * if you want to go man-to-man, I'll break your skinny ass in half.

*Id.* at ¶ 27.

{¶38}   The Second District Court of Appeals found sufficient evidence to support a conviction for intimidation in *Bowshier*. The appellate court concluded:

> [O]ne possible inference arising from Bowshier's physical threats to Bower is that Bowshier understood that his threats constituted an attempt to influence, intimidate, or hinder Bower in the performance of his official duties. This inference involves a conclusion that Bowshier would understand that his threats would have the effect of attempting to induce Bower to placate Bowshier by either letting Bowshier go, or by going easy on him. Because a mere attempt to influence, intimidate, or hinder the public official is sufficient, it is not necessary that the attempt actually had that effect. Because the element of "knowingly" is in the statute, it is necessary that the utterer of the threats shall have understood that his threats would constitute an attempt to influence, intimidate, or hinder the public official.
>
> We conclude that the evidence in the record, together with all reasonable inferences, when viewed in a light most favorable to the state, would permit a reasonable jury to conclude, beyond reasonable doubt, that Bowshier understood that his threats of physical violence constituted an attempt to influence, intimidate, or hinder Bower in the performance of his official duties.

*Id.* at   ¶¶ 73-74.

{¶39}   In the case sub judice, Deputy Wickmann provided testimony that the discharge of his duty was hindered as a result of Wise's threat. Deputy Wickmann testified as follows:

Q. So is the main goal to separate [Wise] and Ms. Lanning?

A. Yes sir.

* * *

Q. When [Wise] said that what did you do with those bags?

A. Dropped them.

Q. And so did you ever pick those bags up and load them back into the car?

A. Not after that. They were already moved by the time we got back out.

Q. So in fact you didn't do part of your job because of that.

A. Correct.

{¶40}    Deputy Wickmann further testified that, "* * * he threatened my life as a means to try to gain something out of the whole incident, not something going his way. He thought the threat towards my life would probably get me to stop doing what I was doing."

{¶41}    Wise was understandably upset with Lanning for her indiscretions of sending risqué text messages to another man. It is also logical that Wise was angry when he had to allow Lanning to remove bags of personal property from the home that he felt that he purchased. We further understand that Wise would be upset watching Deputy Wickmann help Lanning carry the bags out to Lanning's car. However, when viewing the evidence that was before the jury in a light most favorable to the prosecution, a reasonable jury could conclude, beyond a reasonable doubt, that Wise understood that his threats of physical violence constituted an attempt to influence, intimidate, or hinder Deputy Wickmann in the performance of his official duties.

{¶42}     Therefore, we overrule Wise's assignment of error.

## IV. Conclusion

{¶43}     Having overruled Wise's assignment of error, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.


For the Court


By: _____
       Marie Hoover, Presiding Judge




### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**